Argued and submitted October 7, 2014, affirmed December 9, 2015

Patricia N. GIBSON,
in her capacity as successor Trustee to
the Veryl G. Gibson Trust,
*Plaintiff-Appellant,*

*v.*

Sharon BANKOFIER,
an individual;
Duane Bankofier, an individual; and
Oregon Realty Company, an Oregon corporation,
*Defendants-Respondents,*

*and*

CHICAGO TITLE INSURANCE COMPANY;
and Equity Advantage, Inc.,
*Defendants.*

Multnomah County Circuit Court
110201781; A153425

365 P3d 568

Darian A. Stanford argued the cause for appellant. With him on the brief was Slinde Nelson Stanford.

Brian R. Talcott argued the cause for respondents Sharon Bankofier and Duane Bankofier. With him on the brief was Dunn Carney Allen Higgins & Tongue LLP.

Janet M. Schroer argued the cause for respondent Oregon Realty Company. With her on the brief were Marjorie A. Speirs and Hart Wagner LLP.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

SERCOMBE, P. J.

**SERCOMBE, P. J.**

Plaintiff succeeded her mother, Veryl G. Gibson (Gibson), as trustee of a trust for the benefit of Gibson and her family. Defendants Sharon Bankofier, a real estate agent, and Oregon Realty Company (ORC), a realty company, facilitated the purchase of real property interests by the trust when Gibson was the trustee. Several of those investments failed. After Gibson became incompetent, plaintiff, as the successor trustee, brought an action against defendants. Plaintiff claimed that defendants were liable for the trust's economic losses because their conduct constituted financial abuse under ORS 124.100(2) and because they were negligent in their obligations to advise Gibson and the trust about the soundness of the real estate investments.[1]

The trial court granted defendants' motion for summary judgment and dismissed plaintiff's claims.[2] The trial court concluded that there was no claim under ORS 124.100(2), because there was no evidence in the summary judgment record that defendants wrongfully took or appropriated Gibson's money or property under ORS 124.110(1)(a). The court further concluded that the negligence claim did not lie, because plaintiff failed to establish that ORC's relationship to the trust made it accountable for the trust's economic losses and because the claim against Bankofier was untimely filed. On appeal, we conclude that there was no proof that defendant acted wrongfully when Bankofier helped facilitate the purchase of real estate interests. We also conclude that, to the extent that Gibson authorized Bankofier to manage the investment of the sale proceeds,

---

[1] Under ORS 124.100(2), "[a] vulnerable person who suffers injury, damage or death by reason of *** financial abuse may bring an action against any person who has caused the *** financial abuse or who has permitted another person to engage in *** financial abuse." Pursuant to ORS 124.110(1):

"An action may be bought under ORS 124.100 for financial abuse in the following circumstances:

"(a) When a person wrongfully takes or appropriates money or property of a vulnerable person, without regard to whether the person taking or appropriating the money or property has a fiduciary relationship with the vulnerable person."

[2] The trial court also granted summary judgment in favor of Bankofier's husband, defendant Duane Bankofier. Plaintiff does not appeal that ruling. Thus, we refer to defendant Sharon Bankofier alone as "Bankofier."

plaintiff failed to establish that Bankofier breached any duty that arose out of that relationship. Accordingly, we affirm.

Summary judgment is appropriate when "the pleadings, depositions, affidavits, declarations and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law." ORCP 47 C. There is no genuine issue of material fact if, "based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment." *Id.* The following material facts are undisputed and establish the appropriateness of summary judgment in favor of defendants.

At its heart, this case concerns the relationship between Bankofier and Gibson. Gibson and Bankofier first met decades ago when Gibson, who worked as an Avon representative, knocked on Bankofier's door and tried to sell her Avon products. Bankofier turned her down because Bankofier's mother was also an Avon representative, and Bankofier wanted to continue to purchase products from her own mother. Eventually, Bankofier's mother retired as an Avon representative and Bankofier began ordering products through Gibson. Bankofier and Gibson became friends.

In 1990, Gibson and her husband created the Gibson Family Trust. The trust property included their residence and the surrounding land. Gibson's husband passed away in 1991 leaving Gibson as the sole trustee. In late 2005, two real estate agents contacted Gibson and asked if she would be interested in selling her property. The agents were acting on behalf of a developer who was looking to purchase several properties in the neighborhood.

After talking with the agents, Gibson called Bankofier, who had worked as a licensed real estate agent for ORC since 1987 under an independent contractor agreement. Gibson explained what had happened, and asked Bankofier to act as her real estate agent. Bankofier agreed. Gibson signed a seller's broker agreement, and Bankofier worked on a deal with the developer's agent, David Hill.

That deal fell through, however, and Gibson did not sell the trust property in 2005.

In January 2006, Gibson met with an attorney who had been recommended by Bankofier. The attorney helped Gibson to create a new trust, the Veryl G. Gibson Trust, and to transfer into it all of the assets held in the Gibson Family Trust. The trust provided that, on Gibson's death, her three daughters would inherit the entire estate.

In 2007, Hill communicated to Bankofier that someone had inquired about purchasing Gibson's property. Bankofier called Gibson, who expressed interest in a sale; Gibson hoped that selling the property would provide income for herself and her family. Gibson knew that one of her friends had recently sold her home and avoided paying capital gains taxes by using the proceeds from the sale to purchase rental properties. Gibson asked Bankofier if she could arrange a similar transaction.

Under 26 USC section 1031, a person who wishes to sell real property may avoid the immediate tax consequences of that sale by, in essence, exchanging the original property for a replacement property of like kind. In order to qualify for a "1031 exchange," a replacement property must be identified within 45 days of the sale of the original property and purchased within 180 days of that sale. 26 USC § 1031(a)(3). Gibson's friend had completed a 1031 exchange by purchasing rental property with the proceeds from the sale of her home.

Bankofier believed that a 1031 exchange would be a good option for Gibson, but she also told Gibson that purchasing rental properties would not be a good idea—Bankofier knew that Gibson did not have any experience managing rentals. Bankofier was familiar with a different type of investment property, tenant in common properties (TICs), which can also be used as replacement properties in 1031 exchanges. A TIC is an investment property that is owned in common by several different owners. Bankofier first learned that TICs can be used as replacement properties in a 1031 exchange at a training meeting at ORC. She had assisted previous clients with TIC purchases. In January and March of 2007, Bankofier took Gibson to two seminars about TIC

investments. Those seminars were hosted by American Investment Exchange (AIE) and Spectrus, both firms that sell ownership interests in TICs.

Meanwhile, Hill prepared documents to complete the sale of the trust property. The deal was structured so that the home would be sold separately from the surrounding property. With respect to the sale of the home, the parties agreed that they would enter into a lease-back arrangement so that Gibson could remain in the home after it was sold. The proceeds from the sale of the surrounding acreage would be used to purchase investment property in order to complete the 1031 exchange. Gibson reviewed the sale and lease documents with her attorney, Beck. In an April 23, 2007, letter to Gibson, Beck wrote:

> "As we discussed on April 17, 2007, I have reviewed the sale agreement and the lease and believe that both documents are straight forward and appear appropriate to complete the sale transaction and the lifetime lease back to you of the residence portion of the property. I also discussed the agreement and lease in depth with your friend and real estate broker, Sharon Bankofier, earlier that same day. I understand that Sharon will be working with you and that you will also be consulting with your CPA or tax advisor on the tax implications of the sale and are also exploring alternate investments of the sale proceeds to reduce your tax burden based on the sale."

By the middle of May 2007, Gibson had decided that she wanted to use the proceeds from the sale of the home to invest in TICs. On June 7, 2007, Bankofier and Gibson entered into a real estate buyer's agreement. That agreement provided that Bankofier would use her "best efforts to locate and bring to [Gibson's] attention Property of Interest." Bankofier also agreed to "help prepare and present offers on behalf of [Gibson] and negotiate for acceptance of such offers in accordance with Buyer's instructions." The agreement also stated that Bankofier "shall not be expected to render specialized professional services to Buyer such as detailed property inspection, land use or title analysis, tax advice, environmental risk evaluation or legal services. Buyer shall be expected to engage and pay for such professional services separately."

Bankofier contacted various TIC sponsors, including AIE, to gather information about their offerings. Bankofier wrote in an email to AIE, "I am a real estate broker and have a client that has a $1,250,000 property closing within the next month. One million will be used in a 1031 exchange and we are only looking at TICs." Bankofier also asked whether AIE paid a referral fee. Referral fees are paid by the sponsors of TICs to the real estate agents whose clients purchase TIC interests. The fees are paid by the seller of the TIC property and do not affect the purchase price. AIE did pay such fees. Bankofier testified that, when the sponsors that Bankofier contacted sent her information, typically in the form of marketing brochures, she forwarded that information to Gibson.

Bankofier set up a meeting on June 21, 2007, between Gibson and a financial advisor to discuss TIC investments. Bankofier drove Gibson to that meeting. Greg Bowen, one of the financial planners who met with Gibson, took notes that record the following:

"Met with Veryl Gibson (Potential client), Sharon Bankofier (Realtor of 30 years, real estate investor and friend) and Duane Bankofier (Sharon's Husband).

"Veryl recently sold a property in the amount of $1,000,000 and wanted to invest into a 1031 TIC.

"Discussed goals: Wanted to defer capital gains and any income generated from 1031 to possibly go to her children & grandchildren.

"Discussed varied options for 1031 investments and filled out a Substantive Relationship form."

Bowen testified in a summary judgment declaration that "Mrs. Gibson appeared to understand the substance of our discussions and struck me as a sharp, independent woman who knew what she wanted. She exhibited no signs of incompetence and did not appear to be under any duress." Bowen provided Gibson with information about TIC ownership, including the statement, "As with any investment in real estate, there are risks associated with TIC ownership, including fluctuations in the real estate market that will impact the value of property, vacancy rates which can

decrease cash flow, and risks associated with the loss of a major tenant."

According to Bankofier's deposition testimony, Gibson reviewed the information about the TICs that Bankofier had provided. Gibson then decided which TICs to invest in and how much to invest in each TIC. Ultimately, Gibson selected four different TICs as replacement purchases: a medical building in Ohio (New Albany Medical Center), oil and gas interests across several states (Noble Royalties), a strip mall in Tennessee (Parkway Place at Cordova Road), and a retirement community in Georgia (Oaks at Riverstone).

In late June, Bankofier and Gibson met with one of Gibson's daughters, Youngbluth, to discuss the sale of the property and the planned investments. According to Youngbluth's testimony, Bankofier told her that "the decisions had been made but the money had not been invested yet." Bankofier answered Youngbluth's questions about the planned investments and described the TICs that Gibson had decided to purchase. Gibson let Youngbluth do most of the talking. At some point during that conversation, Bankofier told Youngbluth that the TICs would pay $9,000 a month. One week after that discussion, Youngbluth told Bankofier that she had misgivings about the TIC investments. She asked Bankofier to halt the process. Youngbluth did not, however, express her misgivings directly to Gibson. Bankofier, for her part, was confident that the TICs would perform well. In fact, Bankofier expressed interest in purchasing an interest in New Albany Medical Center for herself.

On June 28, 2007, Gibson signed escrow instructions that indicated that she wanted to effect a 1031 exchange. The sale of Gibson's property closed on June 29, 2007. The proceeds from the sale of the property adjacent to Gibson's home went into a segregated exchange account maintained by Equity Advantage, Inc. In order to complete the 1031 exchange, Gibson had to complete the purchase of those properties by December 26, 2007. On July 2, 2007, Gibson executed a purchase and sale agreement for the first TIC property, New Albany Medical Center. Based on those directions by Gibson, money from the exchange account was

transferred to the seller of the TIC. Bankofier earned a commission of $31,250 on the sale of the property, or two and one-half percent of the sales price.

On July 13, 2007, a neighbor went to Gibson's house and found Gibson in the backyard. Gibson had suffered a "syncopal episode" and had fallen down. She was disoriented, partially undressed, and sunburned. Gibson was taken to the hospital where she remained for five days. After her stay in the hospital, Gibson spent 14 days in a rehabilitation facility. Gibson was treated by Registered Nurse Diane Roberts, who noted that Gibson was alert and oriented and that she was "able to express her thoughts and feelings easily." Roberts also opined, however, that Gibson's mental processes were "a bit scattered" and that Gibson appeared to her to have "diminished decisional capacity."

Roberts summarized Gibson's condition as follows:

"This is a difficult situation of an 81 year old female living alone with mild cognitive impairment. She is very resistive to make any changes in her life. She lacks awareness of the seriousness of her recent syncopal episode. I feel she should not be driving due to the diminished decisional capacity, which would affect her ability to make rapid adjustments to changing conditions, recent syncopal episode, and prior episode of tachycardia while driving."

While Gibson was recovering, Bankofier continued to work to complete the 1031 exchange within the time limits required by section 1031. On July 17, 2007, Bankofier emailed AIE to inform them that Gibson "had a fall and is in a rehab center." Bankofier asked AIE to send the paperwork necessary to complete the purchase of the Parkway Place TIC to her home instead of Gibson's. Bankofier took the purchase agreements to the rehabilitation center where Gibson signed the papers.

After she returned home, Gibson authorized the purchase of the remaining three TICs, the last of which was purchased on October 23, 2007. In total, Bankofier received $24,000 in referral fees from AIE for Gibson's purchase of interests in two TICs, New Albany Medical Center and Parkway Place. As provided by the independent contractor agreement, ORC received a percentage of those fees.

Bankofier did not receive referral fees for Gibson's purchase of interests in Noble Royalties or Oaks at Riverstone. Neither Gibson nor the trust paid Bankofier a commission for her work facilitating the purchase of the TICs.

In the months that followed, Gibson's mental state worsened. On November 8, 2007, Dr. Robert Wells, Gibson's primary care physician, opined that Gibson had mild dementia and that it had slowly progressed over the last several months. By July 19, 2010, Wells believed that Gibson was no longer able to manage her business affairs. Dr. Colby Harrison agreed with that assessment. Shortly after that diagnosis, Gibson moved to a nursing home and plaintiff was appointed the successor trustee of the Veryl G. Gibson Trust.

Prior to the filing of the lawsuit, the TICs returned about $249,184 in income to the trust based on an investment of $1,000,000. Three of the TIC investments failed and there is no possibility of future payments. The New Albany Medical Center TIC was the only property interest that was generating income.

Plaintiff brought two claims against defendants. First, plaintiff claimed that defendants' conduct constituted financial abuse under ORS 124.100(2). Second, plaintiff claimed that defendants' negligence caused Gibson to purchase interest in the TICs, which resulted in an economic loss to the trust. Plaintiff's negligence claim is based on the allegation that defendants and plaintiff had a "special relationship" based on Bankofier's status as Gibson's real estate agent and because Gibson authorized Bankofier to "exercise independent economic judgment on her behalf and in her interests."

Defendants moved for summary judgment. Defendants argued that plaintiff failed to produce any evidence to support two elements of plaintiff's elder abuse claim: that defendants took or appropriated Gibson's money or property and that defendants' conduct was wrongful. ORS 124.110(1)(a) (defining "financial abuse" of a vulnerable person under ORS 124.100(2) as "[w]hen a person wrongfully

takes or appropriates money or property of a vulnerable person"). Defendants also argued that plaintiff failed to offer evidence that defendants were negligent and that, in the alternative, plaintiff's negligence claim was barred by the applicable statute of limitations. Defendants contended that Bankofier's sole duties to Gibson and the trust as a buyer's real estate agent were specified by ORS 696.810, Bankofier complied with those statutory duties, and neither defendant assumed or was accountable to plaintiff for a breach of any other duty. Plaintiff responded, in part, by producing an ORCP 47 E affidavit that addressed Bankofier's negligence liability.[3] That affidavit provided:

> "I certify that my law firm has consulted a real estate licensee who is qualified, available and willing to testify to admissible facts and opinions sufficient to create a question of fact as to the liability of former real estate licensee, Sharon Bankofier. The real estate licensee with whom my law firm consulted is willing to testify that the alleged conduct of Sharon Bankofier failed to meet the standard of professional care applicable to the real estate licensee in the circumstances alleged; and the alleged conduct was a cause of the claimed damages, losses or other harm."

The trial court granted defendants' motion and issued a letter opinion. Without elaborating, the court concluded that neither defendant had "control over the Trust money and did not wrongfully receive money or property from [the trust]." The court also concluded that defendants were entitled to summary judgment on plaintiff's negligence claim. The court reasoned that plaintiff's ORCP 47 E affidavit, which mentioned only Bankofier, was insufficient to establish that ORC owed any duty to plaintiff. The court further reasoned that the two-year statute of limitations in ORS 12.110(1) barred plaintiff's negligence claim against Bankofier. Plaintiff appeals.

---

[3] ORCP 47 E provides, in relevant part, that,

"[i]f a party, in opposing a motion for summary judgment, is required to provide the opinion of an expert to establish a genuine issue of material fact, an affidavit or a declaration of the party's attorney stating that an unnamed qualified expert has been retained who is available and willing to testify to admissible facts or opinions creating a question of fact, will be deemed sufficient to controvert the allegations of the moving party and an adequate basis for the court to deny the motion."

We begin with plaintiff's financial elder abuse claim. A civil action for abuse of a vulnerable person is allowed by ORS 124.100(2):

> "A vulnerable person who suffers injury, damage or death by reason of physical abuse or financial abuse may bring an action against any person who has caused the physical or financial abuse or who has permitted another person to engage in physical or financial abuse."

ORS 124.100(1)(e) defines "vulnerable person" to include "[a]n elderly person" and "[a]n incapacitated person." ORS 124.110(1)(a) further describes the circumstances in which an action may be brought under ORS 124.100(2) for financial abuse to include "[w]hen a person wrongfully takes or appropriates money or property of a vulnerable person, without regard to whether the person taking or appropriating the money or property has a fiduciary relationship with the vulnerable person."[4] Thus, there are four elements to a claim for financial abuse of an elderly or incapacitated person: There must be "(1) a taking or appropriation (2) of money or property (3) that belongs to an elderly or incapacitated person, and (4) the taking must be wrongful." *Church v. Woods*, 190 Or App 112, 117, 77 P3d 1150 (2003).

Plaintiff argues that defendants both wrongfully took and wrongfully appropriated money from the trust. First, plaintiff argues that defendants took $24,000 in referral fees. Second, plaintiff argues that defendants appropriated the proceeds from the sale of Gibson's home when they first "structured the sale of the home to facilitate the TIC investments" and then "assumed nearly complete control of the process to apply the proceeds towards the purchase of TICs." There is, however, no evidence that Gibson or the trust suffered any harm as a result of defendants' receipt of the referral fees. As mentioned above, the referral fees were paid by the TIC sponsors, not Gibson or the trust. Rather,

---

[4] The property alleged to be appropriated belonged to the Veryl G. Gibson Trust, not to Gibson herself. Nevertheless, both parties assume that the property at issue is the "property of a vulnerable person," *i.e.*, Gibson, for the purposes of plaintiff's financial elder abuse claim. ORS 124.110(1)(a). Our disposition of this case makes it unnecessary to determine whether the statutory phrase "property of a vulnerable person" includes trust property that is managed by a trustee who is a vulnerable person.

the losses in this case were caused by the failure of three of the four TICs in which Gibson invested. Thus, the viability of plaintiff's statutory financial abuse claim depends on the circumstances under which Gibson purchased the four TICs. ORS 124.100(2) (providing that a vulnerable person may bring an action against their financial abuser when the vulnerable person has suffered harm "by reason of" that financial abuse). For the reasons that follow, even assuming that the purchase of the TICs was an appropriation under ORS 124.110(1)(a), we conclude that no reasonable trier of fact could find that either defendant engaged in wrongful conduct during that transaction.

In *Church*, 190 Or App at 118, we reasoned that, when drafting ORS 124.110(1)(a), the legislature used the term "wrongful" knowing that it has a "well-understood meaning in the law of torts with regard to interference with legal interests." We, therefore, turned to previous cases that discussed the tort of intentional interference with contractual relations for interpretive context. *Id.* (citing *Empire Fire & Marine Ins. v. Fremont Indemnity*, 90 Or App 56, 62, 750 P2d 1178 (1988); *Conklin v. Karban Rock, Inc.*, 94 Or App 593, 601, 767 P2d 444 (1988), *rev den*, 307 Or 719 (1989)). To prove that tort, a plaintiff must show that, "beyond the fact of the interference itself," the defendant possessed an improper motive or used improper means. *Conklin*, 94 Or App at 600. Similarly, to prove statutory financial abuse, a plaintiff must show not just that a defendant took or appropriated money or property, but also that a defendant did so "in pursuit of an improper motive or by improper means." *Church*, 190 Or App at 118. A defendant's motives or means "may be wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession." *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or 201, 209-10, 582 P2d 1365 (1978) (footnote omitted).

On appeal, plaintiff argues that the trial court erred when it concluded that there was no evidence that Bankofier's conduct was wrongful. She argues that a reasonable juror could conclude that Bankofier acted both with an improper motive and through improper means in order to persuade Gibson to invest in the four TICs. The improper

motive, according to plaintiff, was "greed." In support of that allegation, plaintiff notes that Bankofier asked the TIC sponsors about whether they paid referral fees. Plaintiff alleges that the improper means employed by Bankofier were "misrepresentation and undue influence."

We easily reject plaintiff's assertion that Bankofier's inquiry about referral fees is evidence of an improper motive. The record indicates only that, during the course of email exchanges with TIC sponsors, Bankofier asked about whether the sponsors paid referral fees. There is no evidence that Bankofier prioritized finding TICs that paid such fees or otherwise placed her own interests above either the interests of Gibson or the trust. Indeed, Bankofier earned referral fees for only two TICs, and one of those is the only TIC still earning money for the trust. There is also no allegation that it was illegal for Bankofier to receive those fees. We note too that, while Bankofier was paid a commission from the proceeds of the sale of the home, neither Gibson nor the trust specifically compensated Bankofier for her role in facilitating the purchase of the four TICs. Consequently, Bankofier's inquiry about and receipt of referral fees from the TIC sponsors is not evidence of an improper motive—there is nothing improper about seeking lawful compensation for services rendered. *Eusterman v. Northwest Permanente, P.C.*, 204 Or App 224, 238, 129 P3d 213, *rev den*, 341 Or 579 (2006); *Top Service Body Shop*, 283 Or at 210-12.

Plaintiff identifies Bankofier's statement that the TICs would pay $9,000 per month as a misrepresentation because "[t]hat never happened." To qualify as a misrepresentation, however, a statement must consist of more than "mere broken promises, unfulfilled predictions or erroneous conjectures as to future events." *Patterson v. Western L. & B. Co.*, 155 Or 140, 144, 62 P2d 946 (1936). Rather, for a statement to qualify as a misrepresentation, at least one of the following two things must be true: the person who makes the statement must have "knowledge of its falsity[] or awareness of lack of knowledge as to its truth or falsity[,]" *Oksenholt v. Lederle Laboratories*, 294 Or 213, 222, 656 P2d 293 (1982), or the person who makes the statement negligently supplies false information and owes the listener a special duty of care, *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or

149, 159, 843 P2d 890 (1992). Thus, to prove a misrepresentation, there must be some evidence that the speaker was unjustified in making that statement.

Here, in the light most favorable to plaintiff, there is evidence that Bankofier stated that the TICs would earn the trust $9,000 a month and that that never happened. But there is no evidence that would allow a trier of fact to evaluate Bankofier's statement to determine whether she was justified in making it. Without such evidence, there is no way to determine that Bankofier's statement was a misrepresentation or whether it was merely an unfulfilled prediction. It is even unclear whether Bankofier's statement about the anticipated performance of the TICs reflected her own opinion or whether she was simply passing on information she obtained from the TIC sponsors. As the party responding to defendants' motion for summary judgment, it was plaintiff's burden to put forth evidence sufficient to create a question of fact that Bankofier either knew that that statement was false, did not know whether it was true or false, or negligently supplied false information. *See Two Two v. Fujitec America, Inc.*, 355 Or 319, 324, 325 P3d 707 (2014) ("[T]he party opposing summary judgment has the burden of producing evidence on any issue 'raised in the motion' as to which the adverse party would have the burden of persuasion at trial."). Thus, plaintiff's misrepresentation argument is not a basis for reversing the trial court.

We, therefore, proceed to determine whether there is evidence of undue influence. We have applied the doctrine of undue influence to invalidate a will that was produced by a testator who was under the undue influence of one of the will's beneficiaries. As we have explained, "[t]he overriding question in deciding if a will has been executed under undue influence is whether the influencer, by his or her conduct, has gained an unfair advantage by means that reasonable persons regard as improper." *Van Marter v. Van Marter*, 130 Or App 500, 503-04, 882 P2d 134 (1994) (citing *In re Reddaway's Estate*, 214 Or 410, 419, 329 P2d 886 (1958)). Similarly, a contract that is the product of undue influence can be avoided. *Smith v. Ellison*, 171 Or App 289, 15 P3d 67 (2000). In the context of contract law, undue influence has been defined as "'unfair persuasion of a party who is under

the domination of the person exercising the persuasion or who by virtue of the relation between them is justified in assuming that that person will not act in a manner inconsistent with his welfare.'" *Id.* at 293 (quoting *Restatement (Second) of Contracts* § 177(1) (1981)).

In an undue influence proceeding, the party seeking to have probate revoked or a contract voided must first present evidence that the influencer and the victim were in a "confidential relationship" and that some other "suspicious circumstances" were present. *Van Marter*, 130 Or App at 504. The Supreme Court has established a nonexclusive list of suspicious circumstances: whether (1) the defendant participated "in arrangements for or in the execution of the deeds," (2) the donee received "independent advice," (3) the deed was executed in "secrecy and haste," (4) the "decedent's attitude towards others" changed, (5) the "decedent's plan of disposing of her property" changed, (6) there was an "[u]natural or unjust gift," and (7) the donor was susceptible to influence. *Penn v. Barrett*, 273 Or 471, 476-79, 541 P2d 1282 (1975). Once it has been established that the parties were in a confidential relationship and that there were additional suspicious circumstances, an inference of undue influence arises that, unless rebutted, is sufficient to establish undue influence. *Smith*, 171 Or App at 294.

Plaintiff relies on *Smith* to argue that there is evidence that Bankofier and Gibson were in a confidential relationship and of additional suspicious circumstances—*i.e.*, Gibson's mental condition made her susceptible to influence and Bankofier participated in arranging the TIC transactions. Therefore, according to plaintiff, there is evidence from which a trier of fact could conclude that Bankofier unduly influenced Gibson and, consequently, that Bankofier used wrongful means to appropriate the trust's money.

We conclude, however, that plaintiff's argument is premised on a mistaken assumption. Plaintiff assumes that evidence that would be sufficient to create a disputed question of fact about the existence of undue influence in a claim for equitable relief is also necessarily sufficient to establish a disputed question of fact about the existence of undue influence in her statutory claim of financial abuse. To establish that a contract should be revoked or will invalidated due

to undue influence, the party seeking invalidation may rely on the existence of a confidential relationship coupled with suspicious circumstances to create a presumption of undue influence. *See In re Southman's Estate*, 178 Or 462, 482, 168 P2d 572 (1946) ("The existence of a confidential relationship *** when taken in connection with other suspicious circumstances may justify a suspicion of undue influence so as to require the beneficiary to go forward with the proof and present evidence sufficient to overcome the adverse inference."). That presumption may be based on circumstantial evidence—such as whether a donor was susceptible to influence—rather than direct evidence of an alleged influencer's conduct. *See In re Reddaway's Estate*, 214 Or at 420-26 (holding that establishing undue influence requires only "slight evidence" of suspicious circumstances and listing suspicious circumstances that do not involve conduct by the defendant). To establish a *prima facie* case of financial abuse, however, a plaintiff must show that a defendant acted wrongfully—*i.e.*, with an improper motive or by improper means—when taking or appropriating money or property from a vulnerable person. ORS 124.110(1)(a); *Church*, 190 Or App at 117. A plaintiff may satisfy that burden by producing evidence of actions by a defendant that "involve[] the procurement of an unfair advantage." *Church*, 190 Or App at 118. That is, a plaintiff may prove that a defendant engaged in wrongful conduct that constituted undue influence. Nevertheless, ORS 124.110(1)(a) still requires some affirmative evidence that a defendant accomplished a taking or an appropriation through wrongful conduct.

Here, plaintiff has produced circumstantial evidence that Bankofier's role as both real estate agent and friend to Gibson created a confidential relationship between the two women. Plaintiff also offered evidence that Gibson was susceptible to influence. While defendants offered countervailing evidence on that score, we conclude that there are disputed issues of fact as to Gibson's susceptibility to influence. *See Penn*, 273 Or at 479 (reasoning that a person's physical or mental state can make that person susceptible to influence without making that person wholly unable to manage his or her affairs). Therefore, there is evidence that Bankofier was in a position to unduly influence Gibson. As

just explained, however, that is no evidence that Bankofier actually subjected Gibson to undue influence or any other wrongful conduct—there is nothing inherently wrongful about forming a confidential relationship with another person. *See Egr v. Egr et al.*, 170 Or 1, 32, 131 P2d 198 (1942) (the fact that there was a confidential relationship between a son and his parents does not automatically render a transaction between them invalid, because "[e]very son ought to have the confidence of his parents"). Additionally, it is not wrongful for Bankofier to agree to represent Gibson during the purchase of the TICs. Even in the light most favorable to plaintiff, the record in this case shows only that Gibson suffered from a cognitive impairment, but was still competent to direct her business affairs. It is not wrongful to provide business services to a person who, although elderly, is competent to contract with others for professional services.

Plaintiff also points to evidence that Bankofier "participated in arranging the TIC transactions." In the context of this case, however, that generalized observation is far from suspicious—Gibson specifically hired Bankofier to help facilitate a 1031 exchange. Obviously, there is nothing suspicious about a real estate agent who was contracted to facilitate a real estate transaction actually performing those duties.

Furthermore, Gibson received independent advice about the TIC purchases from a financial planner, the purchase of the TICs was openly discussed with other family members, and the purchase of the TICs was in keeping with Gibson's previously established plan to sell her property and use the proceeds in a 1031 exchange. There is no evidence that the fees Bankofier earned were "unnatural or unjust." As noted above, the referral fees were paid by the sellers of the TIC investments, not by Gibson or the trust. Finally, the amount of referral fees paid to Bankofier and ORC, $21,600 and $2,400 respectively, are not exorbitant. Those fees are comparable to the fees that Bankofier earned for facilitating the sale of Gibson's home.[5]

---

[5] A two and one-half percent sales commission (the percentage that Bankofier received for helping to sell Gibson's house) applied to a property worth $1,000,000 would have earned Bankofier and ORC $22,500 and $2,500 respectively.

In conclusion, there is no evidence from which a rational finder of fact could conclude that Bankofier "wrongfully" took or appropriated money or property from Gibson or the trust. That conclusion obviates the need for us to address plaintiff's argument that Bankofier and ORC took or appropriated money from Gibson.

We turn to plaintiff's negligence claim. As mentioned above, the trial court granted summary judgment on this claim on two bases: that plaintiff failed to establish that ORC owed a special duty to plaintiff and that the two-year statute of limitations in ORS 12.110(1) barred plaintiff's negligence claim against Bankofier.[6] Ultimately, we agree that both defendants are entitled to summary judgment in their favor. We reach that conclusion, however, for a reason that was considered, but not adopted, by the trial court. With respect to the statutorily defined duties of a real estate agent to her client, there is no issue of fact that Bankofier did not violate those duties. Furthermore, even assuming that plaintiff is correct that Bankofier began managing the investment funds on the trust's behalf, plaintiff has not produced any evidence that Bankofier breached any duty that arose out of that grant of authority. Therefore, neither Bankofier nor ORC is liable for the negligence claimed by plaintiff.

It is appropriate for us to affirm the trial court's disposition of plaintiff's negligence claims on that alternative basis. We may affirm a judgment for a reason other than the one articulated by the trial court only if certain conditions are met. The alternative basis must either present a pure question of law or the evidentiary record must be "sufficient to support the proffered alternative basis for affirmance." *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001). A record is sufficient when (1) the facts "support the alternative basis for affirmance"; (2) the trial court's ruling is "consistent with the view of the

---

[6] ORS 12.110(1) establishes a two-year statute of limitations for "[a]n action * * * for any injury to the person or rights of another, not arising in contract, and not especially enumerated in this chapter." Plaintiff filed her action against defendants on February 8, 2011. The trial court concluded that Gibson knew of the facts giving rise to any claim for wrongful appropriation or poor investment advice prior to February 8, 2009.

evidence under the alternative basis for affirmance"; and (3) the record would not have developed in a materially different way had the prevailing party raised the alternative basis for affirmance below. *Id.* We conclude that those prerequisites are met here. Defendants argued below that Bankofier did not owe—or, in the alternative, breach—any duty to protect Gibson against economic loss. The parties presented evidence on the scope of Bankofier's duties and whether she breached those duties, including plaintiff's ORCP 47 E affidavit. We conclude that the record is sufficiently developed to allow us to determine the nature and extent of Bankofier's relationship to Gibson, any special duty that resulted from that relationship, and whether Bankofier breached those duties.

A plaintiff may bring a negligence claim to recover only economic losses if certain conditions are met. Economic losses are only recoverable if they are caused by a defendant who has a special relationship with a plaintiff. *Onita Pacific Corp.*, 315 Or at 159. Generally speaking, special relationships are formed when "one party has authorized the other to exercise independent judgment in his or her behalf." *Conway v. Pacific University*, 324 Or 231, 241, 924 P2d 818 (1996). Under those circumstances, the law imposes on the authorized party who undertakes to advance the interests of another a duty "beyond the common law duty to exercise reasonable care to prevent foreseeable harm." *Onita Pacific Corp.*, 315 Or at 159. That is so because

> "one party has authorized the other to exercise independent judgment in his or her behalf and, consequently, the party who owes the duty has a special responsibility to administer, oversee, or otherwise take care of certain affairs belonging to the other party."

*Conway*, 324 Or at 241. The relationship between attorney and client is an example of a special relationship, as is the relationship between an agent and his or her principal and a real estate broker and his or her client. *Onita Pacific Corp.*, 315 Or at 160-61.

Not every special relationship, however, carries with it the same duties. Rather, the precise scope of the duties

that arise out of a special relationship depends on "the roles that the parties assume in the particular interaction where the alleged tort and breach of contract occur." *Strader v. Grange Mutual Ins. Co.*, 179 Or App 329, 334, 39 P3d 903, *rev den*, 334 Or 190 (2002). To determine the scope of a duty to protect against economic losses, "we examine the nature of the parties' relationship and compare that relationship to other relationships in which the law imposes a duty on parties to conduct themselves reasonably, so as to protect the other parties to the relationship." *Onita Pacific Corp.*, 315 Or at 160.

Thus, we assess whether defendants are culpable to plaintiff in negligence for the economic losses of the trust investments by determining (1) whether the facts, in the light most favorable to plaintiff, demonstrate that plaintiff and defendants entered into a special relationship, (2) the scope of the duties owed to plaintiff as implied by that special relationship, particularly as contrasted with the duties defined by other special relationships, and (3) whether plaintiff has produced evidence from which a reasonable trier of fact could conclude that defendants breached any of the duties that arose from defendants' special relationship with plaintiff. *See, e.g., Boyer v. Salomon Smith Barney*, 344 Or 583, 592, 188 P3d 233 (2008).

Here, plaintiff's complaint alleged that defendants owed Gibson a duty to protect her against economic losses based on the following attributes of their relationship:

"(1) Sharon Bankofier and Oregon Realty acted as Veryl Gibson's real estate broker in connection with the sale of the Property; (2) ORS 696.805 establishes special duties beyond the general duty of due care for real estate brokers like Sharon Bankofier and Oregon Realty; (3) Sharon Bankofier and Oregon Realty acted as Veryl Gibson's agent in conjunction with the purchase of the TICs, a real estate transaction; (4) ORS 696.810 establishes special duties beyond the general duty of due care for agents of buyers in a real estate transaction; and (5) Veryl Gibson, a vulnerable person with dementia, authorized Sharon Bankofier, Duane Bankofier and Oregon Realty to exercise independent economic judgment on her behalf and in her interests."

We understand plaintiff's complaint to have alleged that there were two different types of special relationship between defendants and Gibson—a real estate agent/buyer relationship defined by ORS 696.810, and a fiduciary-type relationship in which Gibson authorized defendants to manage the investment of the sale proceeds using their own economic judgment. In the proceedings below, plaintiff contended that Bankofier breached her duties to Gibson under ORS 696.810 by failing to effectively research and evaluate whether the TICs were a smart investment for Gibson and by failing to advise Gibson to seek counsel from a qualified investment advisor. Plaintiff also argued that Gibson authorized Bankofier to select which TICs to purchase. By that authorization, according to plaintiff, Bankofier breached her duty to Gibson by negligently selecting the four TICs.[7] Thus, the issue in this case reduces to whether Bankofier owed Gibson a duty to offer advice about investment strategies or a duty to actually control and direct the investments because of the express duties imposed on a real estate agent by ORS 696.810 or because of the implied duties arising from Gibson's authorizations and Bankofier's actions.

We begin by analyzing the duties that arose from the real estate agent/buyer relationship between Bankofier and Gibson and whether there is evidence that Bankofier breached those duties. A realtor's duties to a client buyer are defined by ORS 696.810.[8] Under that statute, a buyer's agent

---

[7] Plaintiff's complaint further alleged that Bankofier failed to inform Gibson "that at least one or more of the four TICs in question was then involved in litigation" and that Bankofier "negligently structured the transaction involving the sale of the Property to facilitate the 1031 exchange and the TIC investment." Plaintiff did not, however, present any evidence in the summary judgment proceedings to support those last two allegations of negligence.

[8] ORS 696.810 provides, in pertinent part:

"(2) A buyer's agent owes the buyer, other principals and the principals' agents involved in a real estate transaction the following affirmative duties:

"(a) To deal honestly and in good faith;

"(b) To present all written offers, written notices and other written communications to and from the parties in a timely manner without regard to whether the property is subject to a contract for sale or the buyer is already a party to a contract to purchase; and

"(c) To disclose material facts known by the buyer's agent and not apparent or readily ascertainable to a party.

is obligated to, among other things, "make a continuous, good faith effort to find property for the buyer," "disclose material facts known by the buyer's agent and not apparent or readily ascertainable to a party," "disclose in a timely manner to the buyer any conflict of interest, existing or contemplated," "be loyal to the buyer by not taking action that is adverse or detrimental to the buyer's interest in a transaction," and "advise the buyer to seek expert advice on matters related to the transaction that are beyond the agent's expertise[.]" ORS 696.810.

Those duties, as the legislative history of that statute demonstrates, are exclusive of any duties that may have existed at common law. In 2001, the Oregon Legislature enacted a comprehensive revision of Oregon's real estate licensing law. Oregon Laws 2001, chapter 300. As part of that revision, the legislature amended ORS 696.855(1), which provides that certain statutes relating to obligations of real estate agents "do not directly, indirectly or by implication limit or alter any preexisting common law or

---

"(3) A buyer's agent owes the buyer involved in a real estate transaction the following affirmative duties:

"(a) To exercise reasonable care and diligence;

"(b) To account in a timely manner for money and property received from or on behalf of the buyer;

"(c) To be loyal to the buyer by not taking action that is adverse or detrimental to the buyer's interest in a transaction;

"(d) To disclose in a timely manner to the buyer any conflict of interest, existing or contemplated;

"(e) To advise the buyer to seek expert advice on matters related to the transaction that are beyond the agent's expertise;

"(f) To maintain confidential information from or about the buyer except under subpoena or court order, even after termination of the agency relationship; and

"(g) Unless agreed otherwise in writing, to make a continuous, good faith effort to find property for the buyer, except that a buyer's agent is not required to seek additional properties for the buyer while the buyer is subject to a contract for purchase or to show properties for which there is no written agreement to pay compensation to the buyer's agent.

"* * * * *

"(6) Nothing in this section implies a duty to investigate matters that are outside the scope of the real estate licensee's expertise, including but not limited to investigation of the condition of property, the legal status of the title or the owner's past conformance with law, unless the licensee or the licensee's agent agrees in writing to investigate a matter."

statutory right or remedy including actions for fraud, negligence or equitable relief." In 2001, the legislature removed ORS 696.805 and ORS 696.810 (the statutes describing the duties of real estate agents) from the list of statutes that do not alter preexisting common law negligence claims. Or Laws 2001, ch 300, § 49a. Furthermore, the legislature added a subsection to ORS 696.810 that would, with some slight changes in the future, become ORS 696.810(6). Or Laws 2001, ch 300, § 46; Or Laws 2005, ch 393, § 7. After the 2001 change, that new subsection stated that "[n]othing in this section implies a duty to investigate matters that are outside the scope of the real estate licensee's expertise unless the licensee or the licensee's agent agrees in writing to investigate a matter." Or Laws 2001, ch 300, § 46. Those two changes, along with the comprehensive nature of the duties listed in ORS 696.805 and ORS 696.810, convince us that the legislature intended the duties listed in that statute to be exclusive of any duties of a real estate agent that may have existed at common law.

Here, there is no evidence that Bankofier violated any duty set out in ORS 696.810(2). The undisputed evidence in the record indicates that Bankofier did urge Gibson to seek expert advice about TIC investments. In fact, Bankofier scheduled and then drove Gibson to a meeting with a financial planner to discuss investment options for a 1031 exchange including TICs. None of the listed statutory duties expressly obligated Bankofier to research and advise Gibson about investment strategies. Moreover, the statute clarifies that such an obligation is not to be implied from the statute's text. ORS 696.810(6) cautions that

> "[n]othing in this section implies a duty to investigate matters that are outside the scope of the real estate licensee's expertise, *including but not limited to investigation of the condition of property,* the legal status of the title or the owner's past conformance with law, *unless the licensee or the licensee's agent agrees in writing to investigate a matter.*"

(Emphases added.) The statute plainly provides that "investigation of the condition of property" may be "outside the scope of the real estate licensee's expertise" and is not an assumed duty of the licensee "unless the licensee or the

licensee's agent agrees in writing" to undertake that investigation. A condition of a TIC that affects its attractiveness as an economic investment is a "condition of property" under ORS 696.810(6). There is no writing in the record to indicate that Bankofier undertook an obligation to investigate whether the TICs in question were quality investments. In fact, the written evidence in the record is to the contrary. The buyer's agreement that Gibson signed advised that Bankofier "shall not be expected to render specialized professional services to Buyer such as detailed property inspection, land use or title analysis, tax advice, environmental risk evaluation or legal services. Buyer shall be expected to engage and pay for such professional services separately." Therefore, we conclude that, with respect to the agent/buyer relationship that existed between Bankofier and Gibson, Bankofier did not violate the duties of a real estate agent for a buyer as established by ORS 696.810.

Plaintiff's ORCP 47 E affidavit does not change that conclusion. Again, that rule provides, in pertinent part:

> "If a party, in opposing a motion for summary judgment, is required to provide the opinion of an expert to establish a genuine issue of material fact, an affidavit or a declaration of the party's attorney stating that an unnamed qualified expert has been retained who is available and willing to testify to admissible facts or opinions creating a question of fact, will be deemed sufficient to controvert the allegations of the moving party and an adequate basis for the court to deny the motion."

ORCP 47 E. By the rule's own terms, "[t]he filing of an affidavit under ORCP 47 E precludes summary judgment only where expert opinion evidence is *required* to establish a genuine issue of material fact." *Deberry v. Summers*, 255 Or App 152, 163, 296 P3d 610 (2013) (emphasis in original). *See also Hinchman v. UC Market, LLC*, 270 Or App 561, 569-70, 348 P3d 328 (2015) (ORCP 47 E affidavit proper if contention is "susceptible to proof through expert testimony").

Plaintiff's attorney averred that he retained a real estate licensee who was willing to testify that "the alleged conduct of Sharon Bankofier failed to meet the standard of professional care applicable to the real estate licensee in the

circumstances alleged[.]" We conclude that, under plaintiff's theory of the case, expert testimony cannot create a genuine issue of material fact about what duties defendants had to Gibson and the trust or whether defendants breached those duties. That is so for two reasons. First, the standard of care applicable under plaintiff's theory that Bankofier had a duty to offer advice about investment strategies or to control or direct the investments presents a legal question under ORS 696.810(6), not a fact question about applicable industry standards. Second, in the context of this case, plaintiff failed to prove that defendants breached their duties because she failed to offer personal knowledge of any breach of duty, not because she failed to offer expert testimony or the nature of any duty owed to Gibson or the trust.

As explained above, the standard of care for a real estate licensee in these circumstances is determined by ORS 696.810 and any written contract that exists between the parties. The interpretation of a statute is a question of law for the court. As we explained in *Karjalainen v. Curtis Johnston & Pennywise, Inc.*, 208 Or App 674, 681, 146 P3d 336 (2006), *rev den*, 342 Or 473 (2007), "[i]n no event is the *meaning* of a statutory term determined as a question of fact. That is because statutes are—by definition—law, and their interpretation always is a question of law." (Emphasis in original.) Likewise, the interpretation of a written contract is also not the subject of expert testimony, provided that that contract is unambiguous. *Eagle Industries, Inc. v. Thompson*, 321 Or 398, 405, 900 P2d 475 (1995) ("In the absence of an ambiguity, the court construes the words of a contract as a matter of law.").

Here, the buyer's agreement between Gibson and Bankofier unambiguously states that Bankofier would not undertake a duty to offer advice about the quality of the TIC investments that Gibson was considering. There is no evidence that Gibson and Bankofier ever amended that agreement. As a result, ORS 696.810(6) dictates that, as a matter of law, Bankofier had no duty to offer Gibson that type of advice. In short, the scope of Bankofier's duty to offer advice to Gibson about investment strategies or to control or direct the investments as her real estate agent is purely a question

of law in this circumstance—it is not a question of fact that can be answered by expert opinion testimony.

Furthermore, to the extent that plaintiff's attorney averred that an expert was willing to testify that Bankofier breached her duties as a real estate agent, we conclude that that testimony would also not create any genuine issues of material fact. Again, at trial, plaintiff pursued the allegations that Bankofier breached her duties as a real estate agent by failing to adequately research and advise Gibson about the quality of the TICs being considered and by failing to advise Gibson to seek counsel from a qualified investment advisor. An expert's testimony is sometimes required to establish that a defendant has breached a particular duty to an injured plaintiff. *See, e.g.*, *Hinchman*, 270 Or App at 573. Here, however, plaintiff's allegations fail because there is no evidence that Bankofier actually obligated herself in writing to assess the quality of the TIC investments and because there is affirmative evidence that Bankofier did tell Gibson to talk to an investment advisor. To create a fact question on either allegation would require plaintiff to first establish certain predicate facts, such as the existence of a writing in which Bankofier agreed to evaluate the TICs. A witness with personal knowledge about Bankofier's dealings with Gibson might be able to establish such facts, but an expert witness could not. Thus, plaintiff's ORCP 47 E affidavit does not preclude summary judgment in this case. *See Deberry*, 255 Or App at 163 (the plaintiff's ORCP 47 E affidavit did not preclude summary judgment where resolution of an attorney malpractice case depended on personal knowledge of the agreement between lawyer and client rather than expert knowledge about the scope of a lawyer's professional duty of care to a client).

That conclusion, however, does not end the inquiry. That is so because, although ORS 696.810 governs agent/buyer relationships, it does not define the duties of any other type of relationship that may have existed between Gibson and Bankofier. Our prior cases recognize that a professional who voluntarily chooses to act outside of his or her normal responsibilities may become liable for how he or she performs those additional duties. *See Peterson v. McCavic*, 249

Or App 343, 353, 277 P3d 572, *rev den*, 352 Or 564 (2012) ("[A]n escrow agent can assume a duty to the parties when it acts 'extra-contractually' or outside its normal duty."); *Lindstrand v. Transamerica Title Ins. Co.*, 127 Or App 693, 698, 874 P2d 82 (1994) (same); *Wallace v. Hinkle Northwest, Inc.*, 79 Or App 177, 181, 717 P2d 1280 (1986) (a stock broker assumes the duties of a fiduciary if the broker's "client trusts [the broker] to manage and control the client's account and [the broker] accepts that responsibility"). That principle is consistent with our method of assessing the nature of an alleged special relationship, which examines "the roles that the parties assume in the particular interaction" rather than the name the parties use to label their relationship. *Strader*, 179 Or App at 334.

Here, by alleging that Gibson authorized Bankofier to "exercise independent economic judgment on her behalf and in her interests," plaintiff asserted that Bankofier's relationship with Gibson became something other than a real estate agent/buyer relationship—plaintiff alleged that Bankofier essentially managed the real estate investments on behalf of Gibson and the trust. Defendants dispute that allegation, and there is only slight evidentiary support for it in the summary judgment record. We conclude, however, that even if Bankofier was given discretionary control over the real estate investments, summary judgment for defendants on the negligence claim is appropriate because there is no evidence that Bankofier exercised any investment authority negligently.

First, plaintiff has not produced any evidence of the standard of care that Bankofier allegedly breached. As defendants point out in their briefs, allegations that a professional person has breached a standard of care typically require "expert testimony in order to raise a question of fact regarding the appropriate standard of care or whether it was breached." That is so because "what is reasonable conduct for a professional is ordinarily not within the knowledge of the usual jury." *Getchell v. Mansfield*, 260 Or 174, 179, 489 P2d 953 (1971). Here, plaintiff's attorney filed an ORCP 47 E affidavit stating that an expert was willing to testify as to Bankofier's liability for negligence. That affidavit, however, was addressed specifically to the duties of a real estate

broker, not the duties of an investment manager.[9] *See Two Two*, 355 Or at 330 (an ORCP 47 E affidavit that states that an expert will address only specific issues will only defeat summary judgment on those specified issues).

Moreover, we conclude that plaintiff has not presented any evidence that Bankofier engaged in conduct that was so unreasonable that a jury would be able to determine that Bankofier breached a standard of duty without the aid of expert testimony. *See Getchell*, 260 Or at 179-80 ("[I]f the jury is capable of deciding what is reasonable conduct without assistance from an expert medical witness no expert testimony is necessary to establish the standard of care."). Plaintiff alleged at least two ways in which the real estate investments were unreasonably selected: (1) the investments were not diversified because they included only TICs and (2) TIC investments were inherently risky, illiquid, and inappropriate for an 81-year-old woman. Plaintiff, however, has not presented any evidence to demonstrate that the TICs that were selected were unreasonably risky investments, either because TICs are inherently risky or because the four particular TICs were not properly diversified. The mere fact that three of the four TICs lost value during the real estate crash in 2008, as did many other real estate holdings, is insufficient to show imprudence in their selection. Thus, there is no evidence on the record from which a jury could conclude that, assuming that Bankofier was indeed responsible for selecting the four TIC investments, she did so negligently.

Second, there is no evidence that Bankofier breached any other fiduciary-type duties. A fiduciary owes her principal the duties of "loyalty, good faith, and fair dealing." *Pereira v. Thompson*, 230 Or App 640, 654, 217 P3d 236 (2009). Plaintiff alleged that Bankofier breached those duties because, rather than advising Gibson to invest in the highest quality TICs, Bankofier influenced Gibson to invest in TICs that would earn referral fees. As noted, there is no

---

[9] Again, that affidavit provides, in relevant part, that plaintiff's attorney "has consulted a real estate licensee who is qualified, available and willing to testify to admissible facts and opinions sufficient to create a question of fact as to the liability of former real estate licensee, Sharon Bankofier."

evidence of that. Bankofier's inquiries to the TIC sponsors about referral fees are not evidence that Bankofier advised Gibson to invest in those properties. In fact, excluding plaintiff's inadmissible hearsay statements, there is no evidence that Bankofier ever advised Gibson to purchase a specific property.[10] To the contrary, the evidence demonstrates that Gibson approved the purchase of each of the four TICs.

For all of those reasons, we conclude that the trial court was correct to grant summary judgment in defendants' favor. Plaintiff's financial abuse claim fails because there is no evidence that either Bankofier or ORC acted wrongfully in taking or appropriating any money or property that belonged to Gibson. Plaintiff's negligence claim also fails because Bankofier's duties as Gibson's real estate agent were limited to those listed in ORS 696.810 and there is no evidence that she violated any of those duties. Even assuming that Bankofier acted as an investment manager for Gibson and the trust, there is no evidence that she breached any particular duty owed by an investment manager. Furthermore, because Bankofier did not violate any duty she had to Gibson, ORC cannot be vicariously liable for any damages that the trust suffered.

Affirmed.

---

[10] On appeal, as before the trial court, Bankofier objects to portions of plaintiff's testimony in which she talks about statements purportedly made by Gibson. Those statements tend to support plaintiff's assertion that Bankofier was ultimately responsible for the manner in which the trust invested certain proceeds from the sale of the home. Bankofier argues that plaintiff's statements are inadmissible hearsay and plaintiff does not argue otherwise. *See* OEC 801(3); OEC 802. We agree and, therefore, do not consider those statements. *See Andrews v. R.W. Hays Co.*, 166 Or App 494, 502, 998 P2d 774 (2000).